IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LONNY L. NEIMAN, JR.,** | : | |
| **Plaintiff** | : | **CIVIL NO.1:CV-08-1535** |
| **v.** | : | |
| **AMERICAN INTERNATIONAL GROUP, INC. and its subsidiary AMERICAN GENERAL LIFE AND ACCIDENT INSURANCE COMPANY,** | : | **JUDGE SYLVIA RAMBO** |
| **Defendants** | : | |

## M E M O R A N D U M

This case comes to the court based on its diversity jurisdiction found in 28 U.S.C. § 1332, and concerns a dispute over a term life insurance policy ("the policy") purchased by Larry Null, now deceased, from Defendants.[1]  Upon Mr. Null's death on February 22, 2006, Defendants refused to pay the insurance proceeds.  Defendants contend that Mr. Null knowingly or in bad faith concealed information concerning his medical history, and that this information was material to its decision to insure Mr. Null.  Defendants contend that had they known of Mr. Null's true medical history they would have rated him higher, thereby increasing his premiums, or declined coverage altogether.  Plaintiff, Mr. Null's step-son and beneficiary under the policy, brought suit for breach of contract and insurance bad

---

[1]Defendants are American International Group, Inc ("AIG") and American General Life and Accident Insurance Company. ("American General").  In this complaint, Plaintiff listed American General as a subsidiary of AIG; however, in its Corporate Disclosure Statement filed pursuant to Rule 7.1 of the Federal Rules of Civil Procedure, Defendants describe their relationship as follows:

> [American General] is a wholly-owned subsidiary of AGC Life Insurance Company, which is a wholly-owned subsidiary of AIG Life Holdings, which is a wholly-owned subsidiary of [AIG].

(Doc. 6-3.)  For the purposes of this memorandum, the court will refer to AIG and American General collectively as "Defendants" or "American General."

faith. (Doc. 1.)  Defendants asserted a counterclaim seeking a declaratory judgment that the policy was void *ab initio* due to Mr. Null's alleged material misrepresentations.  (Doc. 6.)  The parties conducted discovery, and on September 11, 2009, Defendants filed a motion for summary judgment.  (Doc. 17.)  The parties have briefed the issues, and the motion is ripe for disposition.

I.       **Background**

    A.       **Facts**[2]

        1. **Application for insurance**

        The facts of this case are relatively uncomplicated.  On March 22, 2006, Larry Null died of lung cancer.  Eight months prior to his death, on July 12, 2005, Larry Null and his wife, Joan Null, met with Richard Rohrbaugh, an agent from American General.  With the assistance of Mr. Rohrbaugh, Mr. Null completed a life insurance application seeking the issuance of a "Freedom Term 20 Year" life insurance policy with a face amount of $150,000.  The application was taken by Mr. Rohrbaugh using a Smart Pad computer, which he described as a laptop computer slightly smaller than an 8.5" x 14" legal pad that "has a screen on top that lights up." (Doc. 24-2 at 14 of 78, Richard Rohrbaugh Dep., 39:17-18.)  Specifically, Mr. Rohrbaugh asked Mr. Null the questions on the application which both Mr. Null, and his wife Joan Null, answered.  (Doc. 24-2 at 20 of 78, Richard Rohrbaugh Dep.,

---

[2]In *Forbes v. Twp. of Lower Merion*, 313 F.3d 144, 148–49 (3d Cir. 2002), the Third Circuit reaffirmed its supervisory rule first announced in *Vadino v. A. Valey Engineers,* 903 F.2d 253, 259 (3d Cir. 1990) that "the district courts in this circuit [must] accompany grants of summary judgment hereafter with an explanation sufficient to permit the parties and this court to understand the legal premise for the court's order." *Vadino*, 903 F.2d at 259.  Here, the court will identify those facts that are subject to genuine dispute, and cite to the record in order to highlight the precise nature of any disputed facts.  The court will not cite to the record where the facts are undisputed; instead, the court will rely on the statements of material fact and admissions submitted by the parties.  The materiality of any genuinely disputed facts will be analyzed in the discussion section below.

63:24-64:16.) The answers were then recorded on the Smart Pad by Mr. Rohrbaugh. (*Id.*) At the time the application was completed, Mr. Rohrbaugh was sitting across a table from the Nulls. (*Id.* at 19 of 78, Rohrbaugh Dep, 58:1-6.)

It is undisputed that the application asked the following questions, among others, and that the answers were recorded by Mr. Rohrbaugh who testified at his deposition that they were the answers provided by Mr. Null:

> 4. Within the past 10 years, has any proposed insured been diagnosed as having or been treated for mental illness or brain disorder, diabetes, high blood pressure, stroke, chest pain, disease or disorder of the heart, blood, blood vessels, lungs or respiratory system, muscoloskeletal system, digestive system, liver, kidneys or nervous system, alcohol use or drug use?
>
> *NO.*
>
> 15. Within the past 10 years, has any proposed insured consulted a doctor or been a patient in a hospital, clinic or treatment facility?
>
> *NO.*

(Doc. 19-2 at 3 of 166; 20 of 166.)

Defendants contend that if Mr. Null had answered "yes" to either of these questions that he would have been asked to provide additional information. The parties disagree about what, if any, discussion took place between the Nulls and Mr. Rohrbaugh when he asked these questions. At his deposition, Mr. Rohrbaugh stated that the Nulls told him that Mr. Null had a "sore throat or sniffles" and that he was using some sort of nose spray, and "[i]t just appeared to [him] that [Mr. Null] had a cold." (Doc. 24-2 at 21 of 78, Rohrbaugh Dep., 66:18-67:23.) In contrast, Joan Null testified at her deposition that the parties had a more in-depth discussion about Mr. Null's health problems. She contends that she told Mr. Rohrbaugh that Mr. Null had a "sinus infection and this was our reason for calling him to take life

3

[insurance]; in case he should ever become real ill." (Doc. 24-2 at 59 of 78, Joan Null Dep., 72:24-73:2.) According to Mrs. Null, Mr. Rohrbaugh told them that question number fifteen meant "have you had any surgeries or have you had any, you know, really serious illnesses such as emphysema and– or cancer were you hospitalized." (*Id.,* Null Dep., 73:11-13.) Mrs. Null also testified that in the course of this conversation, she told Mr. Rohrbaugh that a few days before the application Mr. Null had an x-ray, and, in response, Mr. Rohrbaugh said "they mean is there anything seriously wrong with you; do you have cancer, do you have – you know, he repeated a lot of illnesses." (*Id*. at 60 of 78, Null Dep., 74:15-18.)

After completing the application, both Mr. Null and Mr. Rohrbaugh signed the application on the Smart Pad. Mr. Rohrbaugh does not know whether Mr. Null actually read the answers that had been recorded before he signed his name, but stated that he had the opportunity to do so. (Doc. 24-2 at 23 of 78, Rohrbaugh Dep., 75:1-11.) According to Mrs. Null, she told Mr. Null to read what he was signing before he signed it. She does not know if he did or not, but testified that Mr. Rohrbaugh told them that "you can read it if you'd like, he said, but it's what we just went over. He said that it's everything we just did." (Doc. 24-2 at 56 of 78, Null Dep., 61:8-10.) Directly above the place for Mr. Null's signature appeared the following text, in relevant part:

I . . . [a]gree to the following:

(a) All statements and answers in this application are complete and true to the best of my knowledge and belief.

(b) Except as stated in the Conditional Receipt, the insurance shall take effect on the Policy Date shown in the policy if the first full premium has been paid within 31 days of the Policy Date.

(c) No agent has authority to waive any
answer to otherwise modify this application,
or to bind American General Life and
Accident Insurance Company ("Company") in
any way by making any promise or
representation which is not set out in writing
in this application.

. . .

(Doc. 19-2 at 3 of 166; 20 of 166.)

After the initial application, on July 20, 2005, Mr. Null was visited by a
nurse who performed a medical examination, and asked additional questions. The
parties refer to this as the Paramedical Supplement. (Doc. 19-2, 6-7 of 166.) During
this visit, the nurse again asked Mr. Null a series of questions about his health,
including the following:

2. Have you ever been diagnosed or treated for

. . .

c.  Shortness of breath, persistent hoarseness or
cough, blood spitting, bronchitis, pleurisy, asthma,
emphysema, tuberculosis or chronic respiratory disorder?
*No.*
. . .

j.  Disorder of skin, lymph glands, cyst, tumor
or cancer?  *No.*

. . .

6. Other than above, have you within the past 5 years
a.  Had any mental or physical disorder not
listed above?  *No.*

b.  Had a checkup, consultation, illness, injury
or surgery?  *Yes.*

c.  Been a patient in a hosp., clinic,
sanatorium or other medical facility?  *No.*

d.  Had electrocardiogram, X ray other
diagnostic test?  *No.*

5

e.  Been medically advised to have any
diagnostic test hospitalization or surgery
which was not completed?  *No.*

(Doc. 19-2, 6 of 166 (emphasis added).)  Mr. Null explained his "Yes" answer to question 6b by stating that he had an "ICC physical exam - 2/05 WorkFirst, York, Pa." (*Id.*)  Like the initial application, Mr. Null provided oral answers to the questions as they were read by the nurse; unlike the first application these answers were recorded on paper rather than on a Smart Pad.  Despite the answers that were actually recorded on the Paramedical Supplement, Mrs. Null testified at her deposition that she informed the nurse recording the answers that Mr. Null had recently visited the doctor for a sinus infection, and at one point he had some spitting of blood because of some medicine that was given to him.  (Doc. 24-2 at 65 of 78, Null Dep., 94:11-95:6.)  Mrs. Null also testified during her deposition that she informed the nurse that Mr. Null had recently had an x-ray.  (*Id.*, 97:17-25.)  None of this information was recorded on the Paramedical Supplement.  After answering all of the questions, Mr. Null signed the Paramedical Supplement, declaring that the statements shown were true and correct to the best of his knowledge and belief.  (Doc. 19-2 at 6 of 166.)

Based on the information provided in the application and the Paramedical Supplement, American General issued a twenty-year term life insurance policy with a face value of $150,000.00. (Doc. 19-2 at 9-30 of 166.)  The policy was dated August 1, 2005 and delivered on September 1, 2005.  (*Id.*; Doc. 19-3 at 105 of 134.)  The policy included a reservation of right of American General to contest the validity of the policy, within two years of its issuance, based upon misrepresentations.  (Doc. 19-2 at 14 of 166.)

## 2.  **Mr. Null's medical history**

Mr. Null died on February 22, 2006, as a result of lung cancer.  In March of 2006, Defendants received a claim for the proceeds of the insurance policy from Mrs. Null and the policy's beneficiary Lonny L. Neiman, Jr.  Because Mr. Null's death occurred within two years of the date of issue, Defendants exercised their right to investigate and verify the answers.

In the course of this investigation, Defendants obtained medical records from Mr. Null's family doctors—Partners in Family Health—as well as the Lancaster Cancer Center.  These records revealed that Mr. Null visited his family doctor on the following occasions: January, 13, 1997, October 27, 1997, January 6, 2005, April 4, 2005, April 28, 2005, and June 8, 2005.  (Doc. 19-2, at 60-102 of 166.)  On each of these visits, Mr. Null presented himself because he was having sinus pressure, coughing, and cold-like symptoms.  The parties disagree about what Mr. Null was told during these visits.  The medical records themselves state that on each of these visits, Mr. Null was diagnosed as having acute bronchitis, and Defendants contend that he was aware of these diagnoses.  (*See* Doc. 19-2 at 61-95 of 166.)  Defendants point to the deposition testimony of Dr. Adelle Kurtz, who stated that at some point in April 2005 she told Mr. Null that "he may have chronic bronchitis."  (Doc. 19-2 at 114 of 166, Adelle Kurtz Dep., 37:23-24.)  Later in her deposition, however, Dr. Kurtz stated that she does not really remember what she told Mr. Null.  She stated:

> I don't really remember.  All I know is that I kept saying, you know, really we should look into this a little bit more. It's unusual that you're coughing for so long and, you know certainly that – he didn't have anything that pointed towards lung cancer.  You know, it still could have been pneumonia, chronic bronchitis.  So I don't believe that I said I'm concerned that you have lung cancer, we should check an x-ray, but you know, I could have said that.  I don't remember.  I didn't document that I said that.

7

(*Id.* at 43:2-11.)  In contrast, Mrs. Null stated in her deposition that her husband never learned that he had bronchitis—and did not learn that he had cancer until August 15, 2005—and that she did not know that he had been diagnosed with bronchitis until she saw his medical records after he died.  (Doc. 24-2 at 65 of 78, Null Dep., 94-95.)

It is undisputed that on the April 28, 2005 doctor's visit, and again on the June 8, 2005 visit, Dr. Kurtz told Mr. Null that he should have an x-ray of his chest.  She was concerned about his persistent symptoms and thought that an x-ray was necessary to rule out pneumonia and/or lung cancer.  Dr. Kurtz did not tell Mr. Null exactly why she wanted the x-ray.  (*See* Doc. 19-2 at 114 of 166, Kurtz Dep., 34:24-35:11.)  Ultimately, Mr. Null had an x-ray on July 6, 2005, just six days prior to completing his application for life insurance.  The x-ray revealed that Mr. Null had tumor in his left lung.

Dr. Kurtz received the x-ray report on July 8, 2005, and on July 11, 2005, she called Mr. Null and recommended that he have a CT scan of his chest.  During her deposition, Dr. Kurtz could not remember what she told Mr. Null about the chest x-ray.[3]  It is undisputed that on July 13, 2005, Mr. Null had a CT Scan, and that on July 14, 2005, he met with Dr. Kurtz in her office to review the findings of the CT scan.  At this appointment, Dr. Kurtz referred Mr. Null to a pulmonologist for further testing.  Again, the record is unclear what Dr. Kurtz told Mr. Null at this

---

[3]Defendants point to a section of Dr. Kurtz' deposition where she stated that "I think that he understood the gravity of the situation."  (Doc. 19-2 at 120 of 166, Kurtz Dep., 60:6-7.)  This testimony was objected to as speculation at the deposition.  (*Id.*, at 60:8-9.)  Dr. Kurtz' testimony is too vague for the court to find what it is that she actually stated.  For instance, she says that she "probably" did not tell him that he had cancer on the phone, (*Id.*, at 60:18), but that she "probably" said that it was a tumor, (*Id.*, at 60:61).  She later said that she was "sure" that what she said was that "you have a mass or lump in your chest," (*Id.* at 61:7-8.)  While the court does not doubt the veracity of Dr. Kurtz, her testimony is too uncertain for the court to say definitively what she told Mr. Null during the July 11, 2005 telephone conversation.

visit. Although she testified in her deposition that it is very "likely" that she told him that his CT scan "shows a probable cancer," (Doc. 19-2 at 140 of 166, Kurtz Dep., 139:10-11), she also stated that she "can't say absolutely" that she told him that he had cancer. (*Id.* at 139:2.) She also indicated that you "can't use the word cancer until you have that definitive diagnosis," and she acknowledges that Mr. Null did not have a diagnosis of cancer until August 15, 2005.[4] (*Id.* at 154:7-8.)

### 3. <u>Rescission of the Policy</u>

On August 14, 2006, based on their review of Mr. Null's medical history, Defendants advised Plaintiff that his claim for death benefits was denied because "facts pertaining to past medical history were misrepresented in the application" that were material to the risk, and that "if the true facts had been given, this policy would not have been issued." (Doc. 19-3 at 90-91 of 134.) On August 15, 2006, Defendants sent Plaintiff a check for $894.91 representing a refund of all of the premiums paid on the policy. (*Id.* at 93 of 134.)

---

[4]Below is the chronology of events when Mr. Null's medical history is juxtaposed with his application for insurance. As discussed above, the parties dispute whether the diagnoses of acute bronchitis were told to Mr. Null at the time of the appointments.

1/6/05 – doctor's visit with diagnosis of acute bronchitis.
4/4/05 – doctor's visit with diagnosis of acute bronchitis.
4/28/05 – doctor's visit with diagnosis of acute bronchitis; notes say that patient admits having coughed up blood. Mr. Null advised to have a chest x-ray.
6/8/05 – doctor's visit with diagnosis of acute bronchitis. Null advised to have a chest x-ray.
7/6/05 – chest x-ray.
7/11/05 – Dr. Kurtz calls Mr. Null and advises him to have CT scan.
**7/12/05 – Mr. Null applies for insurance.**
7/13/05 – Mr. Null has a CT scan.
7/14/05 – visit with Dr. Kurtz where she refers Mr. Null to pulmonologist.
**7/21/05 – Mr. Null completes the Paramedical Supplement.**
7/28/05 – biopsy.
8/15/05 – diagnosis of cancer.
**2/22/06 – Mr. Null dies.**

## B.  Procedural History

On August 13, 2008, Plaintiff filed a complaint alleging breach of contract and insurance bad faith.  (Doc. 1.)  Defendants filed an answer with a counterclaim on October 17, 2008.  (Doc. 6.)  Defendants' counterclaim contains three different counts alleging material misrepresentation, fraud, and declaratory relief.  Defendants seek a judgment that the policy is cancelled and rescinded *ab initio* because of Mr. Null's failure to disclose his medical history.  After conducting discovery, Defendants filed a motion for summary judgment on September 11, 2009, seeking judgment against Plaintiff on his complaint, and for Defendants on their counterclaims.  (Doc. 17.)  Defendants' motion is fully briefed and ready for disposition by the court.

## II.      Legal Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001).  A factual dispute is "material" if it might affect the outcome of the suit under the applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party.  *Id.* at 248.  The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party.  *Saldana*, 260 F.3d at 232; *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in its complaint. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322-23. "'Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.'" *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

Because subject matter jurisdiction in this case is based on diversity of citizenship, the court looks to the substantive law of Pennsylvania to determine the rights and obligations of the parties. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 77 (1938). The law of the Commonwealth is declared by "its Legislature in a statute or by its highest court." *Id*. The Pennsylvania Supreme Court is the best authority on Pennsylvania law, but when the Supreme Court has not issued a clear pronouncement in a particular area, the court "must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data" to determine what the law is. *McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 661, 663 (3d Cir. 1980); *see also Comm'r v. Estate of Bosch*, 387 U.S. 456, 465 (1967). Opinions from lower Pennsylvania courts are not controlling, but

they are entitled to significant weight when there is no indication that the Pennsylvania Supreme Court would rule otherwise.

## III.    Discussion

The crux of the dispute between the parties is whether Defendants were justified in rescinding the insurance policy issued to Mr. Null based on his admittedly undisclosed medical history.  All of the claims in this case hinge on this issue.  If Defendants were justified in rescinding the policy then Plaintiff's breach of contract and bad faith claims fail as a matter of law, and Defendants would be entitled to the relief sought in their counterclaim.  Thus, the court will determine whether the Policy was void as a matter of Pennsylvania law.

To void an insurance policy under Pennsylvania law, the insurer has the burden to prove that: (1) the insured made a false representation; (2) the insured knew the representation was false when it was made or the insured made the representation in bad faith; and (3) the representation was material to the risk being insured.  *Justofin v. Metro. Life Ins. Co.,* 372 F.3d 517, 521 (3d Cir. 2004) (citations omitted).  The insurer has the burden to prove all three elements by clear and convincing evidence.  *Id.*  This heightened burden of proof must be taken into account in ruling on summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("[T]he determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case.")  "Consequently, where the clear and convincing standard applied, the [court] must inquire whether the evidence presented is such that a jury . . . could only find for one side."  *Justofin*, 372 F.3d at 522.  In the context of an insurance dispute, the Third Circuit has cautioned that on summary judgment the record must "reasonably support[] the inescapable conclusion that [the

insurer] has shown all three elements to void the policy by clear and convincing evidence" before summary judgment can be entered. *Id.* Thus, the court will examine the record with this standard in mind.

## A.    <u>False Representations</u>

The court must first decide whether a rational jury, presented with the evidence before the court, could inescapably conclude that Mr. Null made false representations on his life insurance application and Paramedical Supplement. In Pennsylvania, a false representation includes omission of an insured's medical information. *Justofin*, 372 F.3d at 522 (citing *Grimes v. Prudential Ins. Co. of Am.*, 585 A.2d 29, 31-32 (Pa. Super. 1991)).

Defendants argue that there were several false representations on both Mr. Null's initial application and his Paramedical Supplement. Specifically, Defendants point to the answers to questions number 4 and 10 on the initial application, and questions number 2c, 2j, and 6 in the Paramedical Supplement. *See supra,* pp. 3, 5. Plaintiff does not argue that the answers listed on the application or the Paramedical Supplement are not literally false; instead, Plaintiff contends that there is a genuine issue of material fact concerning what the Nulls told Mr. Rohrbaugh who recorded these answers. While this may be true, the test appears to capture this issue in the second prong —whether the insured knew that the representations were false or made them in bad faith—rather than the first. Thus, the court finds that no rational jury could conclude that the answers to questions 4 and 10 in the initial application and questions 2c, 2j, and 6 in the Paramedical Supplement were not literally false. Accordingly, Defendants have met their burden on this prong of the test.

13

**B. Knowingly false statements or bad faith**

**1. The application and Paramedical Supplement**

In addition to demonstrating that there were false representations, Defendants must show that Mr. Null either knew that the statements were false or made them in bad faith. The gist of Defendants' argument is that the temporal proximity of Mr. Null's application to his medical treatment, diagnostic testing, and diagnosis of lung cancer "indisputably establishes that his responses were made knowingly or in bad faith." (Doc. 18 at 18 of 21.) In contrast, Plaintiff argues that he has presented sufficient evidence to create a genuine issue of material fact concerning whether Mr. Null knew that his answers were false or that he made them in bad faith.

The facts of this case are problematic for disposing of it on summary judgment because knowing that one's statements are false or were made in bad faith involves an inquiry into the state of mind of the person making the statements; a particularly difficult task when the speaker is deceased. Furthermore, an insured's state of mind is generally an issue of fact for the jury because evaluating state of mind often requires the drawing of inferences from the conduct of parties about which reasonable persons might differ. *Justofin*, 372 F.3d at 523-34. Nonetheless, the Third Circuit has instructed that decisions about whether to grant summary judgment on a bad faith insurance claim must be made on a case by case basis examining the evidence before the court, and that summary judgment should be granted where "the *only* reasonable inference a fact finder could draw is that the applicant's answers were knowingly false, or made in bad faith." *Nw. Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 132 (3d Cir. 2005) (emphasis added). Given this standard, based on the evidence presented by the parties, the court concludes that

there is more than one reasonable inference that a fact finder could draw concerning whether Mr. Null's statements were knowingly false or made in bad faith.

Based on the testimony of Mr. Rohrbaugh and Dr. Kurtz, the jury could conclude that Mr. Null knew that he had serious medical problems at the time he applied for the insurance and kept the details of this to himself— including the fact that he had a chest x-ray a mere six-days prior to completing the application for insurance, and that he had a CT scan eight days prior to answering the questions on the Paramedical Supplement. The timing of these events certainly gives rise to an inference that Mr. Null took out the insurance because he was afraid that he had lung cancer, and that he made false statements about his health so that he would be issued a policy. However, Plaintiff has come forward with evidence that, if believed by a jury, could lead to the inference that Mr. Null did not knowingly make false statements or act in bad faith. For instance, in her deposition, Mrs. Null testified that she and Mr. Null told Mr. Rohrbaugh about the July 6, 2005 x-ray at the time of the application, but that Mr. Rohrbaugh assured them that this was not the sort of information that Defendants were looking for. (Doc. 24-2 at 59 of 78, Null Dep., 73:11-13.) Further she testified that she and Mr. Null told Mr. Rohrbaugh about his recent doctor visits where he complained of a sinus infection. (*Id.*, 72:24-73:2.) It is undisputed that Mr. Rohrbaugh controlled the Smart Pad device through which the answers to each question were recorded, not Mr. Null. Furthermore, Mrs. Null testified that although she encouraged Mr. Null to read the application before he signed it, Mr. Rohrbaugh stated that he could read it if he likes, but that it was what they had just gone over. (Doc. 24-2 at 56 of 78, Null Dep., 60:17-21.) The same is true for the statements to the nurse who filled out the Paramedical Supplement. Mrs. Null testified that she and Mr. Null informed the nurse that he had recently had an

x-ray and visited the doctors.   (Doc. 24-2 at 65 of 78, Null Dep., 94:11-95:6; 97:17-25.)

Based on this evidence, a jury could infer that Mr Null was not aware of the falsity of his statements nor did he act in bad faith.  That is to say, it would not be wholly illogical based on this testimony for a jury to conclude that the answers, while literally false, were not made by Mr. Null knowing them to be false or in bad faith.  This is Plaintiff's version of events, and it may well be the truth.  Of course, a jury could discount this evidence as a *post hoc* attempt to salvage the insurance and obtain proceeds from a policy that should have never been issued in the first place. This is Defendants' version of the events, and it may well be the truth.  At this stage of the proceedings, however, all permissible inferences are to be drawn in favor of Plaintiff as the non-moving party.  *See Anderson*, 477 U.S. at 255.  It is only when no reasonable inference supports Plaintiff's version of the facts that the court can grant summary judgment.  *See Babayan*, 430 F.3d at 132 ("Summary judgment may be entered on a rescission claim when, based upon the evidence produced in discovery, the *only* reasonable inference a fact finder could draw is that the applicant's answers were knowingly false, or made in bad faith." (emphasis added)).

The court emphasizes that Defendants have the burden of proving by clear and convincing evidence Mr. Null's state of mind at the time of the application and the Paramedical Supplement, and the court cannot conclude as a matter of law that a jury would "inescapably conclude" that Mr. Null's answers were knowingly false or made in bad faith.  *Justofin*, 372 F.3d at 522.  Inferences require a deduction or conclusion that reason, experience, and common sense lead one to make from the evidence; it is a jury's  role to draw inferences where two plausible conclusions are rationally possible based on the evidence.  Thus, the court concludes

that there are genuine issues of material fact for the jury concerning whether Mr. Null knew that his statements were false or whether he acted in bad faith.

## 2. **Failure to modify answers after the application was submitted**

Defendants contend that evidence of Mr. Null's bad faith can also be inferred from the fact that although he learned of his diagnosis of cancer on August 15, 2005, he did not apprise American General of this diagnosis despite the fact that the policy had not yet been delivered. Defendants assert that Mr. Null owed it a duty of good faith and fair dealing to disclose all things material to the insured risk up until the point that his policy was delivered on September 1, 2005.

The court agrees that the general rule in Pennsylvania is that "the mutual good faith which is required in a contract of life insurance will not permit a recovery where the insured intentionally withholds or conceals material changes in the condition of his health between the date of his examination . . . and the delivery of the policy." *Watson v. Metro. Life. Ins. Co.,* 21 A.2d 503, 504 (Pa. Super. 1941). This rule is premised on the traditional notion the an insurance contract does not take effect until the date of delivery; however, delivery is not essential to the completion of a contract which becomes effective, according to its terms, at some other point in time. *See Mut. Life Ins. Co. of N.Y. v. Hurni Packing Co.,* 263 U.S., 167, 175-76 (1923) ("It was competent for the parties to agree that the effective date of the policy should be one prior to its actual execution or issue. . . ."); *Potts v. Metro. Life Ins. Co.,* 2 A.2d 870, 874 (Pa. Super. 1938) ("Companies issuing insurance policies, as in other contracts, have the right to fix in the policy the date of its beginning, and this date . . . may be prior to, at the time of, or subsequent to its delivery."); *see also Gov't Employees Ins. Co. v. Benton*, 859 F.2d 1147, 1153 (3d Cir. 1988) (in construing the date of issuance of the policy, the court cited *Hurni* and

*Potts* and concluded that the most reliable record of evidence of the policy's effective date was defined by the policy itself).

Here, the application states that "[e]xcept as stated in the Conditional Receipt, the insurance shall take effect on the Policy Date shown in the policy if the first full premium has been paid within 31 days of the Policy Date." (Doc. 19-2 at 3 of 166.)  The policy date listed on the policy is August 1, 2005.  (Doc. 19-2 at 9 of 166.)  In his deposition, Mr. Rohrbaugh acknowledged that the Nulls paid their initial premium at the time of the application.  (Doc. 24-2 at 24-25 of 78, Rohrbaugh Dep., 81:21-82:1.)  In fact, because they paid at the time of the application and he provided them with a Conditional Receipt, the policy arguably went into effect retroactive to the date of the application.  Mr. Rohrbaugh put it this way:

> You can submit a trial application or you can submit a paid application and with a conditional receipt if everything's okay with what the underwriters find the insurance technically would be in force at the time of the signature. If they issue a contract with nonpayment even though the policy might have been issued on their life it doesn't go into force until they have a paid premium conditional receipt in hand at [the] home office.

(*Id.*, 82:7-15.)  Thus, Mr. Null's insurance policy went into effect at the latest on August 1, 2005, which was fifteen days before he received his lung cancer diagnosis.  Given these undisputed facts, the court concludes that Mr. Null's failure to apprise Defendants of his diagnosis does not, as a matter of law, constitute bad faith.

### C.   **Materiality**

Plaintiff also contends that there is a genuine issue of material fact concerning the materiality of the statements on the application and the Paramedical Supplement.  A misrepresented fact is material if being disclosed to the insurer it would have caused it to refuse the risk altogether or to demand a higher premium.

*N.Y. Life Ins. Co. v. Johnson*, 923 F.2d 279, 281 (3d Cir. 1991). In support of their motion for summary judgment, Defendants submitted the affidavit of James Mayberry, a senior underwriter for American General Life and Accident Insurance Company. (Doc. 21., James Mayberry Aff. ¶ 1.) Mr. Mayberry avers that if Mr. Null had disclosed (1) that he had visited Partners in Family Health four times in the six months preceding his application for insurance, and (2) that he had been diagnosed with acute and chronic bronchitis, that Defendants would have declined or suspended Mr. Null's application, and reconsidered issuing the policy only after receiving the results of complete respiratory testing. (*Id.* ¶ 33.) Mr. Mayberry further avers that had the application acknowledged that Mr. Null had a chest x-ray six days before his application, American General would have postponed its decision regarding underwriting until all follow-up diagnostic tests were completed, and ultimately declined his application because of Mr. Null's lung cancer. (*Id.* ¶ 40.)

Plaintiff acknowledges that if Defendants had known that Mr. Null was going to die of lung cancer within a year of taking out the life insurance policy that they would never have issued the policy, and thereby appears to concede the materiality of the information omitted in the application. However, Plaintiff argues that there is a genuine issue of fact concerning whether the information missing was material because of Mr. Rohrbaugh's alleged assertions at the time of the application.

Plaintiff argues that Mr. Rohrbaugh took the position throughout the application process that the medical history disclosed to him at the time of the application—which, according to Mrs. Null, included details about Mr. Null's doctor's visits and his x-ray—was not material to the risk insured because he failed to include it on the application. From the court's perspective, these facts, if believed

by the jury, go to establish whether Mr. Null knowingly made false statements on the application or acted in bad faith as opposed to whether the omissions themselves were material. Plaintiff has pointed to no evidence in the record suggesting that Mr. Rohrbaugh had the authority to approve or deny the insurance policy or control how it was rated—the very heart of materiality in this case—and absent this sort of evidence the court concludes that Mr. Rohrbaugh's statements, even if believed by a jury, do not affect the materiality of the omission. The omissions were material because, had the information been included in the application, Defendants would have either rated the policy higher or denied it altogether. (Doc. 21, Mayberry Aff., ¶¶ 32-33.) Accordingly, the court finds, based on the record before it, that there is no genuine issue of material fact concerning the materiality of the omissions in the application or the Paramedical Supplement.

## IV.        Conclusion

In accordance with the foregoing discussion, the court finds that Defendants' motion for summary judgment should be denied because there is a genuine issue of material fact about whether Larry Null knowingly misrepresented his medical history on the application and the Paramedical Supplement or whether he acted in bad faith. Because this issue is relevant to the disposition of all of Plaintiff's claims, as well as Defendants' counterclaims, summary judgment is improper and Defendants' motion will be denied. An appropriate order will issue.

s/Sylvia H. Rambo
United States District Judge

Dated:  November 9, 2009.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LONNY L. NEIMAN, JR.,** | : | |
| **Plaintiff** | : | **CIVIL NO.1:CV-08-1535** |
| **v.** | : | |
| **AMERICAN INTERNATIONAL GROUP, INC. and its subsidiary AMERICAN GENERAL LIFE AND ACCIDENT INSURANCE COMPANY,** | : | **JUDGE SYLVIA RAMBO** |
| **Defendants** | : | |

# O R D E R

In accordance with the accompanying memorandum of law, **IT IS HEREBY ORDERED THAT** Defendants' motion for summary judgment (Doc. 17) is **DENIED.**

s/Sylvia H. Rambo
United States District Judge

Dated: November 9, 2009.